IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | NO.  3:26-CR-00211-N |
| v. | |
| LONTRELL WILLIAMS, JR. (01) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION
FOR REVIEW OF THE DETENTION ORDER
AND FOR RELEASE ON CONDITIONS**

Respectfully submitted,

RYAN RAYBOULD
UNITED STATES ATTORNEY

*/s/ Claire E. Demers*
CLAIRE DEMERS
Assistant United States Attorney
Texas Bar No. 24132238
ROBERT WITHERS
Assistant United States Attorney
Texas Bar No. 24072758
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600
Facsimile: 214-659-8805
Email: Robert.Withers@usdoj.gov
Email: Claire.Demers@usdoj.gov

## TABLE OF AUTHORITIES

18 U.S.C. § 3142(e)(1). ............................................................................................... 7

*United States v. Acosta-Leyva*, 751 Fed. Appx. 594, 595 (5th Cir. 2019) ............................ 8

*United States v. Anderson*, 819 F. App'x 220, 224 (5th Cir. 2020) .................................... 12

*United States v. Farguson*, 721 F. Supp. 128, 129 n.1 (N.D. Tex. 1989) ............................ 7

*United States v. Mitchell*, 2013 WL 5377869, at *7 (N.D. Tex. Sept. 26, 2013) .............. 13

*United States v. Rueben*, 974 F.2d 580, 585 (5th Cir. 1992) ............................................... 7

# TABLE OF CONTENTS

PROCEDURAL AND FACTUAL BACKGROUND ........................................................ 1

    I.    Williams Jr. orchestrated an armed kidnapping and robbery while on federal home confinement............................................................................................................... 1

    II.    Williams Jr. planned and executed the premeditated armed kidnapping to extort his way out of a recording contract................................................................................ 3

    III.    At the detention hearing, the Magistrate Judge correctly assessed Williams Jr.'s danger to the community and flight risk and ordered he be detained............................ 6

LEGAL STANDARD ....................................................................................................... 7

ARGUMENT AND ANALYSIS ....................................................................................... 8

    I.    The nature and circumstances of the offenses were preplanned, violent, and gratuitous..................................................................................................................... 9

    II.    The weight of the evidence against Williams, Jr. is extraordinarily strong......... 10

        *a.*    *Among other evidence, the government's case includes not one but five cooperating victims and witnesses.* .............................................................................. 10

        *b.*    *The victims' statements are corroborated by the digital and physical evidence gathered in the course of this investigation.* .............................................................. 11

        *c.*    *The defendant's premature jurisdiction argument does nothing to rebut the strength of the evidence, and moreover, fails as a matter of law.* ............................... 12

        *d.*    *A now-remedied scrivener's error in the Complaint does nothing to challenge the weight of the evidence against Williams Jr.* ......................................................... 15

    III.    Williams Jr's history and characteristics paint him as a violent felon, unwilling and unable to follow court-imposed rules....................................................................... 15

        *a.*    *Williams Jr. has a criminal history that includes acts of violence involving firearms.* ............................................................................................................... 15

        *b.*    *Williams Jr. has previously demonstrated an inability to comply with terms of supervision.* .......................................................................................................... 16

    IV.    No condition of release can protect the community or the witnesses against Williams Jr. from the danger he poses. ......................................................................... 20

CONCLUSION .............................................................................................................. 21

Defendant Lontrell Williams Jr. ("Williams Jr.") stands charged with kidnapping, conspiracy to commit kidnapping, Hobbs Act extortion, and conspiracy to the same. He was ordered detained after Magistrate Judge Toliver appropriately determined that Williams Jr. posed both a flight risk and a danger to the community if released. Williams Jr. now moves to revoke this detention order and requests the Court impose conditions of release; however, his detention was, and continues to be, appropriate under the § 3142(g) factors. For the following reasons, this Court should deny the defendant's motion and request for an order setting conditions of release and should continue Williams Jr.'s detention pending trial.

## PROCEDURAL AND FACTUAL BACKGROUND

I. **Williams Jr. orchestrated an armed kidnapping and robbery while on federal home confinement.**

On January 10, 2026, Williams Jr. and his eight coconspirators perpetrated the armed kidnapping and robbery of three victims in a Dallas, Texas music recording studio. Williams Jr.—a popular recording artist who performs under the moniker "Pooh Shiesty"—also leads a Memphis-based street gang referred to as the Choppa Gang.[1] At the time of the offense, Williams Jr. resided in North Texas fulfilling the final months of a 63-month sentence for conspiracy to possess firearms in furtherance of violent and drug trafficking crimes in violation of 18 U.S.C. § 924(o). *See United States v. Lontrell D.*

---

[1] As Memphis Detective Paul Petty previously explained to this Court in the May 27, 2026 hearing regarding codefendant Kedarius Waters' pretrial detention, the Choppa Gang is Memphis-based clique of the Grape Street Crips that has been known to participate in homicides, robberies, carjacking, firearms offenses, and narcotics trafficking. (Dkt. 131 36:16-17; 37 at 2-4.) Williams Jr. is the co-founder of the gang, which has close to a hundred or more members. (Dkt. 131 35:8; 36:23.)

*Williams*, No. 1:21-CR-20357-KMM(1), Doc. 205, (S.D.Fla. April 22, 2022).  As part of his sentence, Williams Jr. was required to reside in a Frisco, Texas apartment and was supervised by case managers with a Bureau of Prisons ("BOP") contractor, Volunteers of America ("VOA"). (Gov. Ex. 3.) Williams Jr.'s home detention included, among others, requirements that he would not:

- Own or possess any dangerous weapon;
- Associate with persons having a criminal record; or
- Consume alcoholic beverages or use controlled substances.  (*Id.*)

Unless given specific permission to do otherwise, Williams Jr. was required by these conditions to "remain at [his] place of residence." But Williams Jr. routinely failed to abide by these conditions throughout the course of his home confinement, assisted in skirting these requirements through the help of collusive VOA employees.

Investigators have now learned that Williams Jr. was involved in an inappropriate relationship with at least one of his VOA case supervisors, and that this VOA employee was actively involved in entering fake day passes that would allow Williams Jr. to travel to unapproved locations while he was supposed to be confined to his residence. This misconduct extended to the day of the kidnapping itself on January 10, 2026. On that day, the employee entered three day-passes, allowing Williams Jr. to travel, and contacted him nineteen times over the course of the day. VOA later terminated the employee for this conduct.

Despite having VOA employees actively assisting him in skirting the requirements of his home confinement, Williams Jr. still managed to be formally written up for violating his conditions on at least four occasions. These included:

Government's Response—Page 2

- Providing a cold urine sample on November 8, 2025, which was documented as a refusal (Gov. Ex. 4);

- Failing to appear for his urinalysis on January 30, 2026 (to which he claimed he was "unable to secure transportation" for) (Gov. Ex. 5);

- Failing to report for his biweekly check-in on March 3, 2026 (Gov. Ex. 6); and

- Claiming that he did not have transportation to report for a scheduled urinalysis appointment on March 21, 2026. When Williams Jr. asked if he could report the next morning for his test, VOA approved this request, yet he still failed to report (Gov. Ex. 7).

On the afternoon of the offense, Williams Jr. was written up for being at an unapproved location, (Gov. Ex. 8). VOA records support the statements provided by the victims and witnesses that Williams Jr. was called and instructed to return to his home immediately, but that he ultimately failed to do so. *See id.*

## II.    Williams Jr. planned and executed the premeditated armed kidnapping to extort his way out of a recording contract.

On the day of the offense, Williams Jr. lured R.D.—a music industry executive and owner of a recording label—and the other victims to Dallas under the guise of participating in a business meeting. Williams Jr. had been signed to R.D.'s recording label for over five years, though throughout much of this relationship Williams Jr. was federally incarcerated.[2] During his incarceration, Lontrell Williams Sr. (Williams Jr.'s father and purported business manager) made numerous unsuccessful attempts to

---

[2] Two months after his early release from BOP, Williams Jr. released a single titled "FDO" or, "First Day Out." FDO debuted at No. 1 on the Billboard Hot R&B/Hip-Hop Songs chart, surpassing Williams Jr.'s previous Billboard No. 6 hit and greatly increasing the commercial value of his record catalog. The song contains purportedly autobiographical elements of Williams Jr.'s incarceration and release, opening with a direct reference to walking out of jail and declaring his contempt for federal authorities, and later describing working out in his cell, reorganizing his gang, and the frustration of being "stuck in the cage" while a war raged outside it.

renegotiate the terms of Williams Jr.'s contract with R.D., including trying to obtain the rights to Williams Jr.'s master recordings.[3] Once Williams Jr. was released to home confinement in October 2025, he personally continued to push these negotiations. While R.D. remained open to negotiating certain aspects of Williams Jr.'s contract, such as his album payouts, R.D. was adamant that he would not give Williams Jr. the rights to his masters. It was under the pretext of continuing these negotiations that R.D. believed he was invited to Dallas.

On January 10, 2026, R.D. traveled to Texas to attend this meeting with his photographer, M.M., his close friend, B.P., and his two former police officer security guards, C.W. and T.D. Williams Jr. arrived at the recording studio meeting with Williams Sr., his fellow Choppa Gang leader and Memphis recording artist Rodney Wright Jr. (a/k/a Big30), his close friend Kedarius Waters, and five other confederates. At the studio, Williams Jr. spoke on the phone with what the victims believed was his parole officer, telling the person he was speaking to that he was not supposed to "be out." After this call, Williams Jr. asked to speak with R.D. in the soundproof recording room adjoining the main control room, with Williams Sr. and Wright Jr. then joining the two in the recording room.

Once inside the recording room, Williams Jr. demanded R.D. release him from his recording contract and produced a printed contractual release for R.D. to sign. A copy of

---

[3] A "master recording" is the original, definitive recording of a musical work from which all copies are made and distributed; ownership of the master confers the right to license, sell, and collect royalties from every subsequent use of that recording.

this "release" (printed by Williams Sr. at Staples hours before the offense) was later recovered from Williams Sr.'s emails. (Gov. Ex. 2). R.D. refused to sign the presented release paperwork, prompting Williams Jr. to instruct Wright Jr. to bring him his bag. When Wright Jr. returned with the bag, Williams Jr. produced an AK-style pistol (described by victims as a "choppa"), pointed it at R.D.'s head, and repeated his demand that R.D. sign the release of contract.

Unsatisfied with merely obtaining the written release of contract, Williams Jr. announced that he wanted to film R.D., and Wright Jr. recorded R.D. on his cell phone stating that "Pooh Shiesty dropped from 1017." All the while, codefendant Demarcus Glover—who had entered the recording room as the altercation ensued—blocked the door holding a Draco:[4]



*Left: Gov. Ex. 1 at 0:00 depicting Williams Sr. holding a document in the recording room; also featured are Williams Jr. (in black) and R.D. (in yellow).*
*Center: Gov. Ex. 1 at 0:05 depicting Glover holding a Draco in front of the recording room door.*
*Right: Gov. Ex. 1 at 0:11 depicting R.D. "releasing" Williams Jr. from his contract.*

---

[4] A "Draco" is a distinct firearm that resembles an AK-47 style rifle.

After obtaining R.D.'s signature and verbal "release" of contract, Williams Jr. robbed R.D. of approximately $450,000 worth of personal property—including his wedding band, a watch, a pair of earrings, and the cash R.D. was carrying in his pocket.

With signed "release" and R.D.'s jewelry in hand, Williams Jr. and Wright Jr. forced R.D. back into the control room at gunpoint, hands raised. There, the violence continued, with Wright Jr. and two other coconspirators blocking the exit door with firearms drawn while the other coconspirators robbed M.M. and B.P. at gunpoint. During the offense, M.M. has described that he was choked to the point of near unconsciousness, while B.P. has recounted to investigators that Williams Jr. held the barrel of his Draco to the back of his head. Williams Jr. and his coconspirators subsequently exited the larger office building encompassing the music studio through one set of doors, while R.D., M.M., C.W., and T.D. left through the other and called 911.

### III. At the detention hearing, the Magistrate Judge correctly assessed Williams Jr.'s danger to the community and flight risk and ordered he be detained.

Williams Jr. was apprehended at his Frisco, Texas apartment on the morning of April 1, 2026 and he made his initial appearance in front of the Honorable Magistrate Judge Toliver on April 3, 2026. (Dkt. 6.) His probable cause and detention hearings were held on April 8, 2026, where FBI Special Agent Pamela Hanson testified for the government. (Dkt. 29.) At the conclusion of this hearing, The Court ordered Williams Jr. to be detained, finding that the "weight of the evidence against [the defendant] is strong." (Dkts. 30, 110 63:23-24.) She was particularly "troubled by [his] prior criminal history" and Williams Jr.'s "participat[ion] in criminal activity in this case while under

supervision." (Dkt. 110 64:3-4.) The Court further highlighted his "history of violence" and weapons charges, his history of substance abuse, and determined that Williams Jr. violated "the most restrictive of the conditions that were imposed by the BOP." (*Id.* 65:11-21.) Therefore, Judge Toliver could not "find that there's any condition or combination of conditions [she] could impose now—*they're almost the same*—that would reasonably assure [Williams Jr.]'s appearance as required and the safety of the community or another person, if released." (*Id.*, emphasis added.)

## **LEGAL STANDARD**

In reviewing a magistrate judge's order of pretrial release, "the district court acts *de novo* and must make an independent determination" of whether release is proper. *United States v. Rueben*, 974 F.2d 580, 585 (5th Cir. 1992) (citing *United States v. Fortna*, 769 F.2d 243, 249 (5th Cir. 1985)); 18 U.S.C. § 3145(a)(1). Review of the record developed before the magistrate judge is an appropriate procedure to comply with that obligation. *See, e.g.*, *United States v. Farguson*, 721 F. Supp. 128, 129 n.1 (N.D. Tex. 1989) (Fitzwater, J.).

The Bail Reform Act of 1984 authorizes pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1). Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both. *See Fortna*, 769 F.2d at 249. A finding that a defendant is a danger to the community must be supported by clear and convincing evidence, while a finding that a defendant is a flight

risk must be supported by a preponderance of the evidence. 18 U.S.C. § 3142(f); *United States v. Acosta-Leyva*, 751 Fed. Appx. 594, 595 (5th Cir. 2019) (citing *Fortna*, 769 F.2d at 243).

The Court must consider four factors in determining whether the pretrial detention standard is met: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including past conduct, criminal history, and probation status; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g).

## <u>ARGUMENT AND ANALYSIS</u>

Neither the facts and circumstances of the offense nor Williams Jr.'s personal characteristics have improved since the April 8 detention hearing. In fact, the strength of the government's case has only increased—including through locating the contract Williams Jr. forced R.D. to sign, and the video of R.D.'s kidnapping and extortion itself. These evidentiary "gaps" that Williams Jr. used as a foundation for his filing have now closed.

Almost equally pervasive in Williams Jr.'s request is the theme that he has previously demonstrated compliance with conditions of home confinement. However, subsequent (and ongoing) investigation into Williams Jr.'s behavior once released from BOP paints a different picture, with his repeated failure to comply with the terms of his home confinement further underscoring the lengths he will go to subvert conditions set by a court or government authority and the danger he poses to the community if released.

As explored below, all four of the Section 3142(g) factors weigh heavily in favor of Williams Jr.'s detention, and no condition or combination of conditions exists that could reasonably mitigate these risks.

I.     **The nature and circumstances of the offenses were preplanned, violent, and gratuitous.**

Williams Jr. stands at the center of this armed kidnapping, robbery, and extortion. It was Williams Jr. who summoned the victims to Dallas. It was Williams Jr. who set the violence on January 10 in motion when R.D. refused his demands, pulling a Draco from his bag and pointing it at R.D. and ultimately escalating an argument into an armed confrontation. It was Williams Jr. who brought with him armed gang members to a business meeting—betraying his own expectation that the encounter would devolve into violence. And it was Williams Jr. who, after robbing R.D., facilitated physical violence and the threat of firearms from his coconspirators to rob M.M. and B.P. and bar R.D.'s security team from entering the room. Williams Jr. refused to be satisfied holding R.D. at gunpoint to sign a "release;" instead, he continued to terrorize the victims by stealing their personal valuables.

The victims' statements provided to law enforcement on the date of the offense, as well as their statements in subsequent interviews with investigators, recount that they feared they would be executed by Williams Jr. and his fellow coconspirators. This fear is not unfounded—during the robbery that famously led to Williams Jr.'s previous federal conviction, two victims were shot and wounded. For the victims and witnesses of Williams Jr.'s instant offense, the trauma of the incident has not dissipated in the

subsequent months, with security officer C.W. recounting the fear he and his family still experience in the letter to the Court attached as Government's Exhibit 9. Taking together the circumstances of the offense and Williams Jr.'s crucial role in its commission, this factor weighs heavily in favor of his detention.

## II. The weight of the evidence against Williams, Jr. is extraordinarily strong.

The brunt of Williams Jr.'s argument in favor of his pretrial release is premised on his perception that the weight of the evidence in this case "does not support detention," but in arguing this factor disregards a substantial portion of the government's case. (Dkt. 124 at 5.)[5] That case includes the cooperation of all five victims and witnesses, cellphone location data and surveillance video placing the coconspirators at the scene, and the video Wright Jr. filed of R.D. in the recording room, being forced to declare that Williams Jr. was "dropped" from his label and released from his contract. Judge Toliver called this evidence "strong" on April 8 on a record that did not yet include the release paperwork or the video. Both have now been recovered.

### a. Among other evidence, the government's case includes not one but five cooperating victims and witnesses.

Williams Jr.'s Motion (Dkt. 124 at 5) erroneously asserts that the "sum total of the [g]overnment's case" rests solely on a single victim, R.D., who he further claims has now publicly recanted. Preliminarily, it is telling that Williams Jr. provides no exhibits, evidence, context, or citations to support the repeated assertion in his filing that *any*

---

[5] Notably, while weight of the evidence is a factor for the court to consider, courts "have found this factor to be of least importance in the detention determination." *United States v. Nwagbara*, 2011 WL 6372342, at *2 (N.D. Tex. Dec. 19, 2011).

victims of this offense have publicly recanted, aside from his conclusory assertions of the same. The government is presently unaware of any statements made by any of the victims that in any way challenge the consistent narrative provided to law enforcement since the very date of the incident: that R.D. was forced to sign a release of contract at gunpoint by Williams Jr., that he was then forced to provide a verbal "release" captured on video, that he was then robbed of his possessions inside the recording room, and that after this initial extortion and kidnapping, Williams Jr. and his confederates *continued* the kidnapping and robbery of the victims in the control room.

In April 2026, after each coconspirator had been apprehended, investigators conducted follow-up interviews with all five cooperating witnesses and victims. Each remained consistent with their prior accounts and reaffirmed their cooperation with the prosecution. Williams Jr.'s contention that the single witness has recanted (Dkt. 124 at 2, 5, 11) is unsubstantiated by anything in his motion and refuted by the victims' and witnesses' consistent accounts of the offense.

### b. *The victims' statements are corroborated by the digital and physical evidence gathered in the course of this investigation.*

The government provided physical evidence at the April 8 detention hearing: leg monitor data (Dkt. 111 18:7-11), surveillance footage and a receipt from Staples (*Id.* at 19:1-4, 14-15, 17-18), and social media posts of the stolen jewelry. (*Id.* at 20:22-25, 21:1-6.)  Since then, it has recovered a copy of the "release of contract," (Dkt. 131 11:15-23; Gov. Ex. 2) and video of the kidnapping (Gov. Ex. 1)—both of which corroborate the victims' accounts. Williams Jr.'s claim that no "physical evidence" exists is flatly wrong

even at this juncture, with the forensic review of seized devices and warrant returns still ongoing. On a record this strong, and still growing, the weight-of-the-evidence factor favors detention more heavily than it did when Magistrate Judge Toliver first weighed it.

### c. *The defendant's premature jurisdiction argument does nothing to rebut the strength of the evidence, and moreover, fails as a matter of law.*

Williams Jr. argues that there is a genuine question whether the charged conduct is a federal crime, and that this should weigh against his detention. He is wrong. As a threshold matter, this argument challenges only the kidnapping charges. Even if Williams Jr. were to prevail, the Hobbs Act extortion and conspiracy counts would remain.

Briefly entertaining the merits of his jurisdictional argument—notwithstanding that the proper vehicle to raise and litigate this concern is through a motion to dismiss— Williams Jr. misunderstands what § 1201(a) requires. The government satisfies the interstate commerce nexus by showing that the defendant used any means, facility, or instrumentality of interstate or foreign commerce in committing or furthering the offense. Fifth Circuit Pattern Jury Instructions § 2.54. A cell phone is such an instrumentality, and the Fifth Circuit has repeatedly upheld its use in furtherance of an offense as sufficient to meet this element. *See, e.g., United States v. Anderson*, 819 F. App'x 220, 224 (5th Cir. 2020) (finding § 1201(a)'s jurisdictional element met where the defendant and other robbers' use of cell phones "before, during, and after the robbery to communicate while traveling, to maintain lookouts during the robbery, and to schedule a meeting" to divide the stolen property); *United States v. Mitchell*, 2013 WL 5377869, at *7 (N.D. Tex. Sept.

Government's Response—Page 12

26, 2013) (Lindsay) (noting that a telephone used in a kidnapping can be classified as a means, facility, or instrumentality of interstate or foreign commerce).

In this case, Williams Jr. used a cellphone to (among other things) send text messages to R.D. coordinating the January 10 meeting and to converse with a VOA employee from the music studio prior to the offense regarding his ongoing noncompliance with his home confinement location requirements. He encouraged Wright Jr. to capture R.D.'s verbal "release" of contract using Wright Jr.'s cellphone. And, he sent a "call to arms" to a group chat containing Choppa Gang members using an encrypted cellphone messaging application, Signal, in the days leading up to the offense to gather an entourage to accompany him to Dallas:

 

*Above: Williams Jr., using the name "Michael Myers," discussing needing six "certi" or certified, which is believed to refer to certified gang members with two drivers for that Saturday—January 10th, 2026. Featured in the chat are responses from (among others) codefendants "Damfoo" a/k/a Terrance Rogers and "Glizzy" a/k/a Darrion McDaniel.[6]*

This evidence is more than sufficient to surpass the jurisdictional hurdle of federal prosecution for this kidnapping, and Williams Jr.'s assertion that the defendant's phone itself must be "used across state lines in furtherance of the kidnapping" (Dkt. 124 at 4) simply misunderstands the law.

---

[6] In the above messages, the group message is simply labeled "C." At one time, this group message was entitled "Certified Members Only." Upon information and belief, Certified Members Only or "CMO" is a subset of the broader Choppa Gang, of which Williams Jr. has repeatedly previously claimed leadership of.

> ### d. A now-remedied scrivener's error in the Complaint does nothing to challenge the weight of the evidence against Williams Jr.

Williams Jr.'s final argument rests on a scrivener's error in the Complaint and his claim that "four months have passed without anyone correcting it." (Dkt. 124 at 6.) But Williams Jr.'s own pleading shows that SA Hanson corrected the error at the probable cause hearing once it was raised. (*Id.* at 6, Dkt. 110 36:2-3.) Magistrate Judge Toliver then found the government had met its burden, holding that "there's probable cause to believe that you committed the law violations alleged in the Criminal Complaint" and that "the weight of the evidence against [Williams Jr.] in this case is strong." (*Id.* 63:9-25.) The correction carried through on all subsequent process. And since the initial detention hearing, a grand jury in this district has returned a true bill against Williams Jr. on these charges. The Complaint's inadvertent reference to the "control room" rather than the "recording room" does nothing to weaken the government's case and fails to provide any justification for Williams Jr.'s pretrial release.

## III. Williams Jr's history and characteristics paint him as a violent felon, unwilling and unable to follow court-imposed rules.

> ### a. Williams Jr. has a criminal history that includes acts of violence involving firearms.

On the date of the kidnapping and robbery, Williams Jr. was still serving his 63-month sentence for conspiracy to possess firearms in furtherance of violent and drug trafficking crimes. The conduct behind this prosecution and subsequent conviction was prolonged and severe and included Williams Jr. shooting individuals on two separate occasions.

Williams Jr. and his Choppa Gang affiliates had been on law enforcement's radar since at least 2018. In December 2019, Memphis Police Department officers executed a search warrant at Williams Jr.'s residence and found him sitting on a Glock .22 pistol, along with a 50-round drum magazine loaded with approximately 24 rounds, marijuana, and bulk currency. In July 2020, Williams Jr. reportedly threw fireworks at a gas station, drove away, and returned in the same vehicle—at which point an occupant of the vehicle shot at the gas station.

On October 9, 2020, Williams Jr. drove a lime green McLaren with a fellow Choppa Gang leader to commit an armed robbery. As he would later do in the instant case, Williams Jr. arranged the meeting under the guise of a business transaction, telling his victim he wanted to buy sneakers, codeine, and marijuana, and to discuss his McLaren rental terms. Instead, Williams Jr. and his associates brandished firearms. Williams Jr. ultimately shot one victim with his Draco; his fellow gang leader shot a second. The entire incident was caught on surveillance video.

If this pattern of violence was not enough, in May 2021—while out on state bond—Williams Jr. shot a security guard at a club as he and his entourage were being removed from the venue. Prior to this assault, Williams Jr. had performed at this very club and had traveled to this performance armed.

### b. *Williams Jr. has previously demonstrated an inability to comply with terms of supervision.*

Williams Jr. says his conduct since his release "speaks for itself," and, on that matter, the government concurs. But unfortunately for Williams Jr., his assertions that he

reported for every urinalysis and "complied with all the conditions of home detention without exception" *see generally* (Dkt. 124 at 8) are easily refuted by the records obtained from the VOA.

In the months surrounding the offense, VOA formally documented at least five violations of Williams Jr.'s conditions. He provided a cold urine sample on November 8, 2025 (recorded as refusal). (Gov. Ex. 4.) On the afternoon of the kidnapping and extortion itself, VOA wrote Williams Jr. up for being at an unapproved location. (Gov. Ex. 8.) When his supervisors called and told him to return home immediately, he refused. (*Id.*) His noncompliance continued after his January 10th criminal episode, with Williams Jr. failing to appear for urinalysis on January 30, 2026 with the excuse claimed of lack of transportation. (Gov. Ex. 5.)  He missed his biweekly check-in on March 3, 2026. (Gov. Ex. 6.) And, when he again claimed he could not get to a urinalysis appointment on March 21, VOA agreed to let him report the next morning instead—yet Williams Jr. still failed to show. (Gov. Ex. 7.)

SA Hanson[7] has now obtained Williams Jr.'s VOA location pass information (Gov. Ex. 10) and has compared it to Williams Jr.'s GPS location data. When she did so, she noted **16 instances** where Williams Jr.'s location pass did not match his actual location between December 5, 2025 and March 3, 2026. (Gov. Ex. 11.) Text messages recovered from Williams Jr.'s phone show him reporting his true location (i.e., consistent with his

---

[7] SA Hanson is a FBI Cellular Analysis Survey Team ("CAST") expert with specialized training in analyzing and distilling location data.

leg monitor data but contradicting the VOA passes he submitted) further demonstrating his knowledge of the entry of these false passes. (Gov. Ex. 12.)

As a condition of home confinement, Williams Jr. was also required to abstain from alcohol and narcotics. Nevertheless, his text messages expose his ongoing failure to do so, beginning around the time of his release from BOP. Below is a sampling of some of these messages:



*Left: Williams Jr. (blue bubbles) responding to the inquiry of what he was doing with that he was "[h]igh and drunk"*
*Right: Williams Jr. (blue bubbles) texting that he was "drunk"*



*Above: Williams Jr. texting that he is "drunk asf" (i.e., drunk as fuck)*

This conduct persisted after he committed the January 10 kidnapping and extortion and, in the words of his filing, "knew" of the investigation into him:



*Left: Williams Jr. (blue bubbles) in January of 2026 admitted he is "[g]etting drunk."*
*Right: Williams JR. (blue bubbles) discussing being "torn up" and passing out in the studio due to his alcohol consumption.*

And if alcohol consumption alone was not enough, Williams Jr. even admits at one point to getting in a car accident while drinking and driving:



*Above: Williams Jr. (blue bubbles) discussing getting in a rec [sic] while intoxicated.*

These consistent violations over the entire course of his home confinement are not the lapses of somebody trying and occasionally falling short. His own text messages

**Government's Response—Page 19**

betray his flippant attitude that he remain sober and clean. And, Williams Jr. built his official record of noncompliance while at least one VOA employee was actively helping him evade his conditions by entering fake passes so he could leave home. Even with an insider clearing the way, he could not, or would not, comply. This is not a defendant who can be trusted to follow a court's conditions, but one who treats them as obstacles to be overcome.

**IV.    No condition of release can protect the community or the witnesses against Williams Jr. from the danger he poses.**

The danger here is concrete. Williams Jr. himself has shot at least two people (across two separate incidents). He leads a Memphis street gang of roughly a hundred members—a gang that, as a Memphis gang detective has already testified in this prosecution, commits homicides, robberies, carjackings, and firearms and drug offenses. (Dkt. 131 36:16-17.) And, when a business dispute did not go his way, he resolved it by luring the other side to Texas and putting a gun to a man's head. This is an individual who uses deception and violence to get his way.

Electronic monitoring cannot answer the entirety of the danger that Williams Jr. poses if released, as a monitor tracks where Williams Jr. is but does nothing to stop what he orders done. Put differently, Williams Jr. on his own poses a real and present danger to the community, but even more so, he poses a danger through the power and control he asserts over his gang affiliates. As his messages to his fellow gang members highlight, Williams Jr. is a man who can summon an armed entourage at his will. He did exactly that for the January 10 episode—all while ordered confined to his home and while

wearing an ankle monitor. Detention does not erase his influence over the gang, but it does put a barrier between him and the people who carry out his orders.

Williams Jr.'s proposal to hire a private monitor offers no such barrier. Williams Jr. has already shown what he does with the people assigned to supervise him: he compromises them. He carried on a personal relationship with a VOA case manager who did his bidding and permitted him to travel beyond the bounds of his confinement seemingly undetected. A monitor of his own choosing is, if anything, easier to corrupt than one imposed by the government.

## CONCLUSION

For all these reasons, there are no conditions or combinations of conditions that would sufficiently mitigate the danger Williams Jr. poses to the community or his flight risk. Accordingly, the Court should deny his Motion (Dkt. 124), decline to impose conditions of release, and continue to detain Williams Jr. pending trial.

## Table of Exhibits

| No. | Description |
| --- | --- |
| 1 | Video file |
| 2 | Document Titled "Termination and Release" |
| 3 | Williams Jr.'s Bureau of Prison Release Conditions |
| 4-8 | Incident Reports from VOA |
| 9 | Impact Letter from C.W. |
| 10 | VOA Pass Information |
| 11 | Pass Report Detailing Williams Jr.'s Reported Locations versus Actual Location |
| 12 | Text messages between Williams Jr. and VOA workers |